NOT RECOMMENDED FOR PUBLICATION
File Name: 04a0073n.06
Filed: November 8, 2004

No. 03-4125

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

SOUTHSIDE RIVER RAIL TERMINAL,  )
INC. and ROYAL INDEMNITY  )
COMPANY,  )
 )
    Plaintiffs-Appellants,  )  ON APPEAL FROM THE UNITED
 )  STATES DISTRICT COURT FOR THE
v.  )  SOUTHERN DISTRICT OF OHIO
 )
CSX TRANSPORTATION, INC.,  )
 )  OPINION
    Defendant-Appellee.  )
 )

Before: MERRITT, MOORE, and GILMAN, Circuit Judges.

**RONALD LEE GILMAN, Circuit Judge.**  Southside River Rail Terminal, Inc. and Royal

Indemnity Company (collectively Southside) are seeking indemnity from CSX Transportation, Inc.

for damages resulting from the misdelivery of a tank car. The misdelivery caused the contamination

of a Southside storage tank that contained a liquid owned by a third party. Southside appeals from

the district court's grant of summary judgment in favor of CSX. The primary issue on appeal is

whether a provision in the agreement between Southside and CSX that required Southside to obtain

liability insurance also insulated CSX from liability. Southside claims that the district court erred

in determining that the provision absolved CSX and further argues that the court should not have

applied the agreement to the dispute in the first place. For the reasons set forth below, we **AFFIRM**

the judgment of the district court.

## I. BACKGROUND

Southside operates a rail terminal that stores bulk liquid products. CSX provides freight transportation by rail throughout the eastern United States. On September 15, 1990, Southside and CSX entered into an agreement (the Agreement) providing for the construction, maintenance, and use of a private sidetrack in Cincinnati, Ohio. Under the terms of the Agreement, Southside uses the sidetrack to tender rail freight to CSX for delivery on CSX's main rail line and also to receive freight deliveries from CSX.

Section 1.1 defines the scope of the Agreement as applying to the "tender and receipt of rail freight traffic for the account of [Southside]." The Agreement also includes several provisions relating to the liability of the two parties. Specifically, § 11.1 contains the following indemnity clause:

> Any and all damages, claims, demands, causes of action, suits and expenses (including attorney's fees and costs), judgments and interest whatsoever (hereinafter collectively "Losses") in connection with . . . loss of or damage to any property whatsoever arising out of or resulting directly or indirectly from the construction, maintenance, repair, use, alteration, operation or removal of the Sidetrack shall be divided between the parties as follows:
> (A) Each party shall indemnify and hold the other party harmless from all Losses arising from the indemnifying party's willful or gross negligence, its sole negligence and/or its joint or concurring negligence with a third party.
> (B) The parties agree jointly to defend and bear equally between them all Losses arising from their joint or concurring negligence.

Section 11.2 of the Agreement further provides that

> [Southside], at its sole cost and expense, must procure and maintain in effect during the continuance of this Agreement [] a policy of Commercial General Liability Insurance insuring liability assumed or contracted and under this Agreement with a limit of not less than $3,000,000 Combined Single Limit for personal injury and property damage per occurrence. The Policy must contain a Contractual Liability

> Coverage Endorsement, referring to this Agreement by date, name of Railroad, description of Agreement, and location covered.

Pursuant to § 11.2, Southside purchased a Commercial General Liability Policy from Agricultural Excess and Surplus Insurance Company.

One of Southside's clients is Cognis Corporation, for whom Southside stores a liquid known as kosher methyl ester. Sometime before June 12, 2000, CSX notified Southside that a tank car, purportedly from Cognis, was ready for delivery. Southside received the tank car, numbered GATX 26106, on June 14, 2000. After verifying that the number on the tank car matched the number provided by CSX, Southside began to pump the contents of the car into a large storage tank reserved for Cognis's methyl ester. Southside soon realized, however, that the substance in the tank car was not in fact methyl ester. Instead, the car contained an inedible fatty acid that CSX was supposed to deliver to Peter Cremer North America, another rail customer. The Bill of Lading accompanying the tank car correctly identified its contents and destination, but Southside either did not receive the Bill or did not read it before accepting the misdelivered car. Although Southside immediately stopped pumping the fatty acid into the storage tank once it discovered the error, the methyl ester in the tank had already been irreparably contaminated.

Cognis asserted a claim against Southside for the loss of its methyl ester. Southside submitted the claim to both Agricultural and Royal. As Southside's general liability insurer, Agricultural denied the claim. Royal, however, which provided coverage for property damage, tendered to Cognis a payment of $574,471.40 because the property policy also provided liability coverage. In exchange for the settlement payment, Cognis agreed to release Southside from all liability. Southside and

Royal subsequently filed the present action that seeks contribution and/or indemnity from CSX for the payment to Cognis, as well as $45,000 in additional damages associated with the incorrect delivery of the tank car.

The district court granted summary judgment in favor of CSX on the ground that the Agreement—specifically the provision requiring Southside to purchase liability insurance—absolved CSX from liability for the misdelivery. On appeal, Southside argues that the district court erred in applying the Agreement to the dispute and that, even if the Agreement does apply, the court erred in determining that the insurance provision absolved CSX from liability.

## II. ANALYSIS

### A. Standard of review

We review a district court's grant of summary judgment de novo. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir. 2002). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B. Application of the Agreement to this dispute

Southside first contends that the insurance provision in the Agreement cannot shield CSX from liability because the Agreement itself does not apply to the misdelivery of the rail car in question. According to Southside, although both parties had duties to Cognis, those duties were separate and independent, and therefore did not emanate from the Agreement. (Southside's duty was to receive, store, and ship kosher methyl ester for Cognis, whereas CSX's duty was to deliver car GATX 26106 to Peter Cremer North America for storage.) As a result, the delivery of the fatty acid was allegedly not "for the account of" Southside as required by Section 1.1 of the Agreement.

CSX contends that Southside cannot now question the district court's application of the Agreement because it did not raise the issue below, citing *Michigan Bell Tel. Co. v. Strand*, 305 F.3d 580, 590 (6th Cir. 2002), which noted that this court will ordinarily not address arguments raised for the first time on appeal. This is a correct statement of the law, but it is inapplicable to the present case because Southside, during the course of oral arguments on CSX's motion for summary judgment, contended that the Agreement does not apply to the misdelivered tank car. At that time, the court and Southside's counsel engaged in a lengthy discussion, encompassing approximately ten pages of the hearing transcript, regarding whether the Cognis car was delivered "for the account of" Southside. The argument was therefore properly raised. Nonetheless, it fails for lack of merit. Southside does not dispute that it instructed CSX to deliver the tank car to the sidetrack or that it accepted the car for delivery. The fact that the car did not turn out to be the Cognis car Southside expected does not negate that it was delivered "for the account of" Southside.

**C.      The insurance provision of the Agreement**

Whether the provision in the Agreement requiring Southside to purchase insurance coverage relieves CSX from liability for its own negligence is the key issue in this case. CSX contends that the Agreement required Southside to obtain the insurance for their mutual benefit, thereby shielding CSX from liability. Southside argues, however, that the insurance was only for its own benefit and that the insurance provision was not intended to relieve CSX of liability. The district court determined that "under Ohio law a contract agreement to purchase insurance is deemed to be for the mutual benefit of both parties and manifests the intent of the parties to the contract to hold the other harmless in the event that one party incurs liability." It concluded that "the language in the [Agreement] establishes an agreement to purchase insurance sufficient to absolve Defendant from any liability it incurred pursuant to the misdelivery of the chemicals."

Almost all of the relevant caselaw addressing the effect of contractual agreements to purchase insurance involve lease provisions requiring a landlord to buy coverage for a fire loss. In those cases, the courts generally prohibit a lessor's insurer from recovering against a negligent lessee unless the lease clearly expresses the parties' intent that the insurance coverage be limited to the lessor's own negligence. *See, e.g., Safeco Ins. Co v. Capri*, 705 P.2d 659, 660-61 (Nev. 1985) (holding that, because the lease did not contain an express provision establishing the negligent tenant's liability for fires, the tenant was an implied coinsured of the landlord); *Cerny-Pickas & Co. v. C.R. Jahn Co.*, 131 N.E.2d 100, 103 (Ill. 1956) (holding that the lease provision requiring the landlord to pay for fire insurance exonerated the tenant from any liability due to fire damage to the leased premises caused by the tenant's own negligence). Otherwise, the courts will assume that the parties intended for the insurance to be for their mutual benefit. *See Safeco* 705 P.2d at 660.

Ohio is among those states recognizing the exculpatory effect of a lessor's purchase of liability insurance. In *United States Fire Ins. Co. v. Phil-Mar Corp.*, 139 N.E.2d 330 (Ohio 1956), for example, the Ohio Supreme Court evaluated a lease requiring the lessee to pay any additional insurance premiums imposed on the lessor—the actual policyholder—as a result of the lessee's occupancy. The court concluded that "it was contemplated that the lessor would carry insurance on the property and look to the insurance for compensation for any loss by fire. If the parties had intended otherwise, there would have been no reason for such provision." *Id.* at 333.

The rationale for assuming that an agreement to purchase insurance is for the mutual benefit of the parties, absent some clearly expressed contrary intent, is largely rooted in public policy. Most important is the desire to effectuate the intent of the parties. *Tate v. Trialco Scrap, Inc.*, 745 F. Supp. 458, 473 (M.D. Tenn. 1989). As the *Tate* court explained:

> If the parties agree that one person shall purchase insurance, it is only natural that they assume that the insurance is for their mutual benefit and that the parties will look only to the insurance for loss coverage. Otherwise, there is no reason to put the insurance clause within the lease. It would be mere surplussage. And the natural expectation of the parties is that each lease provision has meaning.

*Id.*

If the parties did not intend for an insurance policy to cover both parties, they would presumably each acquire their own coverage, thereby eliminating the need for any contractual duty to obtain coverage. *Morsches Lumber, Inc. v. Probst*, 388 N.E.2d 284, 287 (Ind. Ct. App. 1979) (acknowledging that, by agreeing to insure, "[n]either party intends to assume a potential liability; rather both are demonstrating 'normal' business foresight in avoiding liability and allocating it to an insurer").

Some courts, however, have taken the minority view by refusing to find that the contractual obligation to purchase insurance indicates an intention to exonerate the other party from his or her negligence in the absence of an express stipulation to that effect. *See, e.g., United States Fidelity & Guar. Co. v. Let's Frame It*, 759 P.2d 819 (Colo. Ct. App. 1988) (holding that the landlord did not waive a claim against the lessee by virtue of an insurance provision in the lease); *Sears, Roebuck & Co. v. Poling*, 81 N.W.2d 462 (Iowa 1957) (holding that the tenant store's lease did not relieve it from liability to the landlord for a fire loss because the lease did not clearly express such an intention). But this approach is not the law in Ohio.

In the present case, the parties dispute whether the Agreement demonstrates a clear intent that Southside's insurance is not for their mutual benefit. Both have legitimate arguments given that the Agreement contains two provisions that appear to be in conflict with one another. The first is §11.1, which suggests that the parties are responsible for their own negligence by (1) requiring each party to indemnify and hold the other harmless if it is willfully or grossly negligent, solely negligent, or jointly or concurrently negligent with a third party, and (2) requiring the parties to "jointly defend and bear equally all [l]osses arising from their joint or concurring negligence." Southside argues that this provision makes each party liable for its own negligence, notwithstanding the other's insurance coverage. The other provision, § 11.2, requires Southside to purchase coverage "insuring liability assumed or contracted under this Agreement." Because this provision is not explicitly limited to coverage for liability incurred by Southside, CSX counters that it too is covered by the Agricultural policy.

As mentioned earlier and as noted by the district court, in Ohio a contract to purchase insurance insulates both parties from common law liability in the absence of a clearly expressed intent to the contrary. *Phil-Mar*, 139 N.E.2d at 333. But *Phil-Mar* is arguably distinguishable from the present case on the basis that the lease in *Phil-Mar* required the lessee to pay any additional premiums resulting from its high-risk manufacturing activities in the leased building. Under such an arrangement, notions of fairness suggest that the lessee should also receive the benefit of the insurance. The same considerations do not apply here because Southside was fully responsible for the cost of the insurance, with no contribution from CSX. Ohio courts have, however, applied *Phil-Mar* to leases in which one party was solely responsible for the acquisition and cost of casualty insurance. *See Buckeye Union Ins. Co. v. Consol. Stores Corp.*, 587 N.E.2d 391, 395 (Ohio Ct. App. 1990) (applying *Phil-Mar* to a lease requiring the landlord to insure the property against fire or other casualty customarily covered by a fire and extended coverage policy). Thus, the mutual-benefit principle announced in *Phil-Mar* is applicable to the present case.

Also convincing is the decision in *Tate v. Trialco Scrap, Inc.*, 745 F. Supp. 458 (M.D. Tenn. 1989), in which the court considered a contract similar to the Agreement here. In *Tate*, a lease provision holding the lessee responsible for damage inflicted by him appeared to conflict with a provision requiring the lessor to purchase fire insurance. The court ultimately determined that the general repair and maintenance obligations within the lease were not a sufficient manifestation of an intent to preclude the insurance coverage obtained by the lessor from also applying to the negligent lessee who caused the loss. *Id.* at 474.

We are persuaded that, in light of *Phil-Mar* and *Tate*, the Agreement between Southside and CSX demonstrates an intent that Agricultural's general liability insurance policy benefit both parties. The policy should therefore cover the liability incurred by both of them relating to the misdelivery of the fatty acid tank car, as the district court determined. Worth noting, however, is an alternative theory that might logically explain why CSX would require Southside to obtain liability insurance without also intending for the insurance to insulate CSX from liability. This alternative theory posits that CSX was concerned that Southside lacked the ability to pay for any damages for which Southside might be held responsible under § 11.1.

But such a theory has not been articulated by Southside, the district court, or any of the cases cited earlier that embrace the minority view. Moreover, the record does not suggest any reason for such a concern. The deposition transcript of the general manager of Southside, in fact, reveals that Southside also carried an excess policy in addition to the Agricultural policy. We will, therefore, give no further consideration to this potential explanation that was not raised by either of the parties or by the district court.

Finally, the provisions allocating liability in § 11.1 do not, as Southside suggests, evidence a contrary intent. Nor do they render the Agreement ambiguous, which would require that it be construed against CSX. Despite Southside's claims that §§ 11.1 and 11.2 are inconsistent, the provisions can be read harmoniously. The district court did so when it noted that "§ 11.2 requires a statement of liability assumed or contracted under the Agreement and § 11.1 provides [for] that liability."

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.