RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0241P (6th Cir.)
File Name: 03a0241p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

KELLOGG COMPANY,
*Plaintiff-Appellant,*

*v.*

No. 01-2394

TOUCAN GOLF, INC.,
*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Michigan at Kalamazoo.
No. 99-00091—Wendell A. Miles, District Judge.

Argued: May 6, 2003

Decided and Filed: July 23, 2003

Before: SUHRHEINRICH and COLE, Circuit Judges;
CARR, District Judge.

———————

**COUNSEL**

**ARGUED:** Daniel S. Mason, ZELLE, HOFMANN,
VOELBEL, MASON & GETTE, San Francisco, California,

———————

* The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

for Appellant. Gerard Mantese, MANTESE &
ASSOCIATES, Troy, Michigan, for Appellee. **ON BRIEF:**
Daniel S. Mason, Christopher T. Micheletti, ZELLE,
HOFMANN, VOELBEL, MASON & GETTE, San
Francisco, California, for Appellant. Gerard Mantese,
MANTESE & ASSOCIATES, Troy, Michigan, John J.
Conway, Detroit, Michigan, for Appellee.

———————

**OPINION**

———————

SUHRHEINRICH, Circuit Judge. Plaintiff-Appellant
Kellogg Company appeals from the district court's
affirmation of the Trademark Trial and Appeal Board's
(TTAB) decision to permit the registration of the word mark
"Toucan Gold" by Defendant-Appellee Toucan Golf, Inc.
(TGI), a manufacturer of promotional golf equipment.

Kellogg claims that TGI's word mark and its corresponding
toucan logo create a likelihood of confusion with, and dilute
the distinctiveness of, Kellogg's five federally-registered and
incontestable "Toucan Sam" logos and word mark under the
Lanham Act as amended, 15 U.S.C. §§ 1051, *et seq.*

We affirm the decision of the district court and deny
Kellogg's claims. TGI's use of the word mark "Toucan
Gold" does not create a likelihood of confusion among
consumers, principally because TGI's use of its mark is in an
industry far removed from that of Kellogg. Also, TGI's
toucan logo, as a realistic toucan design, does not create a
likelihood of confusion with Kellogg's more cartoonish
"Toucan Sam" designs. Furthermore, Kellogg has not
presented any evidence that TGI's use of its marks actually
dilutes the fame or distinctiveness of any of Kellogg's marks.

## I.  Facts

Kellogg, a Delaware corporation based in Battle Creek, Michigan, is the largest producer of breakfast cereal in the world.  On July 24, 1963, Kellogg first introduced Toucan Sam on boxes of "Froot Loops" cereal.  Kellogg has used Toucan Sam on Froot Loops boxes, and in every print and television advertisement for the cereal, since.  Toucan Sam is an anthropomorphic cartoon toucan.  He is short and stout and walks upright.  He is nearly always smiling with a pleasant and cheery demeanor, but looking nothing similar to a real toucan.  He has a royal and powder blue body and an elongated and oversized striped beak, colored shades of orange, red, pink, and black.  He has human features, such as fingers and toes, and only exhibits his wings while flying.  Moreover, in television advertisements over the past forty years, Toucan Sam has been given a voice.  He speaks with a British accent, allowing him to fervently sing the praises of the cereal he represents, and to entice several generations of children to "follow his nose" because "it always knows" where to find the Froot Loops.

Kellogg is the holder of five federally-registered Toucan Sam marks at issue in this case.  The first was registered on August 18, 1964, under United States Patent and Trademark Office[1] (USPTO) Reg. No. 775,496, and consists of a simplistic toucan design, drawn with an exaggerated, striped beak, standing in profile with hands on hips and smiling, as reproduced below:

---

[1]In 1964, the USPTO was known as the United States Patent Office.



The second mark was registered March 20, 1984, under USPTO Reg. No. 1,270,940, and consists of an updated version of the same toucan, standing and smiling with his mouth open widely; and pointing his left index finger upward:



The third mark is for the word mark, "Toucan Sam."  This mark was registered on June 18, 1985, under USPTO Reg. No. 1,343,023.  The fourth mark, registered on June 21, 1994, under USPTO Reg. No. 1,840,746, is a shaded drawing of Toucan Sam flying, with wings spread, and smiling.



The fifth mark, registered January 31, 1995, under USPTO Reg. No. 1,876,803, is essentially the same drawing as in the fourth mark, except unshaded, as reproduced below:



Together the five registrations indicate that Kellogg's marks are for use in the breakfast cereal industry, and on clothing.

In 1994, Peter Boyko created TGI, an Ohio corporation with its principal place of business in Mansfield, Ohio, with his wife, Janice Boyko, and daughter. TGI is a manufacturer of golf equipment, mainly putter heads. TGI creates putter heads from polycarbonate plastics, purchases shafts and grips from outside sources, and then assembles and sells the putters. Principally, TGI's clientele consists of companies who use TGI's goods as promotional gifts at charity events. For this purpose, TGI prints the name or logo of its client on the putter head or other piece of equipment being sold. TGI rarely, if ever, sells directly to retailers or the public.

TGI likewise uses a toucan drawing, known as "GolfBird" or "Lady GolfBird," to represent its products. TGI has placed this logo on letterhead, business cards, its web site, and even on the outside of its building in Mansfield. GolfBird has a multi-colored body, and TGI displays GolfBird in a myriad of color schemes for different purposes. Invariably, however, she has a long, narrow, yellow beak with a black tip, not disproportionate to or unlike that of a real toucan. GolfBird is always seen perched upon a golf iron as if it were a tree branch. She has no human features whatsoever, and resembles a real toucan in all aspects except, perhaps, her variable body coloring:



TGI has not registered its GolfBird logo with the USPTO. On December 15, 1994, however, TGI did file an "intent to use" application with the USPTO for the word mark "Toucan Gold." The application, as later amended, sought to use the mark in relation to "golf clubs and golf putters." Specifically, TGI planned to use the mark for its newest line of putters which consist of a putter head on a Boron Graphite shaft. On August 29, 1995, the USPTO published TGI's application for opposition. Kellogg filed an opposition with the TTAB, asserting that TGI's proposed use of the mark "Toucan Gold" for golf-related merchandise infringed upon Kellogg's Toucan Sam marks under the Lanham Act by creating a likelihood of consumer confusion. On May 19, 1999, the TTAB dismissed the opposition without testimony.

On July 16, 1999, Kellogg appealed the TTAB decision to the district court below, and commenced a *de novo* review

under 15 U.S.C. § 1071(b). In its complaint, Kellogg again claimed that TGI's use of the word mark "Toucan Gold" created a likelihood of confusion among consumers with respect to Kellogg's Toucan Sam word mark. Kellogg added a likelihood of confusion claim with respect to the GolfBird logo as well. Furthermore, Kellogg added a dilution claim under the Federal Trademark Dilution Act of 1995 (FTDA). *See* 15 U.S.C. §§ 1063 and 1125(c). On September 6, 2001, after a four day bench trial, the district court dismissed Kellogg's complaint. The judgment was then entered on September 10. The court found that confusion was highly unlikely, principally because Kellogg is in the business of selling cereal, whereas TGI is in the business of selling putters. Moreover, the court found no dilution because the parties' marks are "visually and verbally distinct." Kellogg filed a notice of appeal on October 4, 2001, and this matter is timely before this Court pursuant to Fed. R. App. P. 4(a)(1)(A).

## II. Standard of Review and Jurisdiction

The TTAB "may refuse to register a trademark that so resembles a registered mark 'as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive.'" *Recot, Inc. v. Becton*, 214 F.3d 1322, 1326 (Fed. Cir. 2000) (quoting 15 U.S.C. § 1052(d)).

The federal courts have jurisdiction over appeals from the TTAB. A party who lost before the TTAB may appeal the decision to the United States Court of Appeals for the Federal Circuit under a "substantial evidence" standard of review. *See, e.g., In re Thrifty, Inc.*, 274 F.3d 1349, 1350 (Fed. Cir. 2001). Otherwise, a party may appeal the TTAB decision, to be reviewed *de novo*, to the United States District Court in any district where venue is proper. 15 U.S.C. § 1071(b)(1). A disappointed party may present new evidence before the district court that was not presented to the TTAB. *Dickinson*

*v. Zurko*, 527 U.S. 150, 164 (1999). Kellogg has chosen the latter route.

We review the district court's legal conclusions *de novo*; but review its factual conclusions for clear error. *See McLaughlin v. Holt Pub. Schs. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003).

## III. Analysis

Essentially, Kellogg seeks to block the registration of the "Toucan Gold" word mark, and to prevent further commercial use of both the word mark and the GolfBird logo. To this end, Kellogg asserts that there is a Lanham Act violation because there exists a likelihood that consumers will be confused as to the source of TGI's products. Moreover, Kellogg asserts that, regardless of our confusion analysis, TGI's use of its marks dilutes the fame of Kellogg's marks, and therefore TGI is in violation of the FTDA.

### A. Likelihood of Confusion

In order to show trademark infringement under the Lanham Act, and that TGI is not entitled to registration, Kellogg must show that TGI's use of its marks constitutes use "in commerce" of a "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . ." 15 U.S.C. § 1114(1); *see also Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003).

This Court has established an eight-part test for determining when a likelihood of confusion exists between the origins of two products. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629-30 (6th Cir. 2002); *Daddy's Junky Music Store, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997); *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 648

(6th Cir. 1982). The factors are: (1) the strength of the plaintiff's mark; (2) the relatedness of the goods or services offered by the parties; (3) similarity of the marks; (4) any evidence of actual confusion; (5) the marketing channels used by the parties; (6) the probable degree of purchaser care and sophistication; (7) the defendant's intent; and (8) the likelihood of either party expanding its product line using the marks. *Therma-Scan*, 295 F.3d at 630; *Daddy's Junky Music Stores*, 109 F.3d at 280; *Frisch's Restaurants*, 670 F.2d at 648. Not all of these factors will be relevant in every case, and "[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). Thus, the question here, as in all trademark cases, is whether we believe consumers of TGI's golf equipment are likely to think it was manufactured by Kellogg. *See, e.g.*, *Taubman Co.*, 319 F.3d at 776 (stating that the only relevant question is whether there is confusion as to the origin of the respective products) (citing *Daddy's Junky Music Stores*, 109 F.3d at 280). None of the factors is dispositive, but the factors guide us in our ultimate determination. *See Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 627 (6th Cir. 2000).

### 1. Strength of Kellogg's Marks

The first factor of the test focuses on the distinctiveness of a mark and the public's ability to recognize it. *See Therma-Scan*, 295 F.3d at 631. In *Daddy's Junky Music Stores*, we recognized a spectrum of distinctiveness for trademarks, ranging from "generic" to "fanciful." *Daddy's Junky Music Stores*, 109 F.3d at 280-81. For example, the word "cereal" is generic, whereas the names "Xerox" and "Kodak" are fanciful, having been completely fabricated by the trademark holders. *See Eastman Kodak Co. v. Weil*, 137 Misc. 506, 243 N.Y.S. 319 (1930); *see also Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 505 (5th Cir. 1979); *Arrow Distilleries, Inc. v. Globe Brewing Co.*, 117 F.2d 347, 349

(4th Cir. 1941) (giving as other examples of fanciful marks "Aunt Jemima" and "Rolls Royce"); *cf. Aunt Jemima Mills Co. v. Rigney & Co.*, 247 F. 407, 409 (2d Cir. 1917).

We find the "Toucan Sam" word mark and logo each to be fanciful. Kellogg completely created the name "Toucan Sam." Kellogg also completely fabricated Toucan Sam's logo design. He does not resemble a real toucan. His unique shape, coloring, size, and demeanor are entirely the creation of Kellogg, and not reminiscent of anything seen in the wild. Therefore, as a logo, he is also a fanciful mark and distinctive.

In further support of the strength of its Toucan Sam marks, Kellogg has submitted survey information indicating that 94% of Americans recognize Toucan Sam, and 81% of children who recognize him correspond him with Froot Loops. Moreover, Kellogg has submitted extensive records detailing the massive amount of time, money, and effort expended in regard to the marketing of Toucan Sam and Froot Loops. We need not delve into Kellogg's records; we find the fact that Kellogg is the largest cereal maker in the world, that Froot Loops is one of its best selling cereals, and that Toucan Sam has appeared in every print and television advertisement for Froot Loops since 1963 enough to establish that Toucan Sam is visually recognizable by an overwhelming cross-section of American consumers. Coupling that with his distinctiveness, Toucan Sam is a very strong mark.

### 2. Relatedness of the Products

In consideration of the second factor, we must examine the relatedness of the goods and services offered by each party. We have established three benchmarks regarding the relatedness of parties' goods and services. First, if the parties compete directly, confusion is likely if the marks are sufficiently similar; second, if the goods and services are somewhat related, but not competitive, then the likelihood of

confusion will turn on other factors; finally, if the products are unrelated, confusion is highly unlikely. *Therma-Scan*, 295 F.3d at 632; *Daddy's Junky Music Stores*, 109 F.3d at 282.

TGI makes golf equipment, mainly putter heads. TGI also sells bag tags, divot tools, and full sets of clubs, but has never sold any merchandise unrelated to golf.

Kellogg is primarily a producer of breakfast cereal, but has branched off from cereal and sold products in other industries on a limited basis. It has also at times licensed its name and characters to outside companies. Kellogg asserts before this Court that it has sufficiently entered the golf equipment industry. In support of this claim, Kellogg presents a catalog, wherein it offers for sale golf balls and golf shirts on which is imprinted the picture of Toucan Sam. Moreover, Kellogg has presented a mass-marketed 1982 animated television advertisement wherein Toucan Sam is portrayed soliciting his Froot Loops on a golf course, and interacting with a golf-playing bear. Kellogg claims these materials indicate that the Toucan Sam marks are related not only to the manufacture of breakfast cereal, but to the golf equipment industry as well.

However, Kellogg, although it is the largest producer of breakfast cereal nationally, has not presented evidence that its golf "equipment" has been marketed nationally. The golf balls and shirts are available on a limited basis, either through the aforementioned catalog— which is not widely distributed— or through select local theme stores, such as Kellogg's own "Cereal City" in Battle Creek, Michigan. Moreover, the commercial in which Toucan Sam plays golf is nonetheless an advertisement for Froot Loops, not golf equipment. The district court found that Kellogg's presence in the golf industry was insignificant, and nothing more than a marketing tool to further boost sales of its cereal. We agree. We find that one thirty second advertisement does not render Toucan Sam a golfer, nor does a novelty catalog make Kellogg a player in the golfing industry. In any event,

trademark law is grounded on a likelihood of confusion standard. We find that no consumer would associate Kellogg with top-line golf equipment based on Kellogg's extremely limited licensing of its characters on novelty items. We also believe that if any consumers ever did associate Kellogg and Toucan Sam with golf based on the 1982 commercial, it is highly unlikely that they would still do so twenty years after the advertisement last aired. We find the parties' products completely unrelated. And under the benchmarks established in this Circuit, the second factor therefore supports a conclusion that confusion is not likely to occur. *See Therma-Scan*, 295 F.3d at 632 (stating that confusion is highly unlikely where goods are completely unrelated).

### 3. Similarity of the Marks

Kellogg argues that it can prove a likelihood of confusion notwithstanding the unrelatedness of the goods. It has presented several cases to demonstrate that courts have held for trademark owners relying heavily on the similarity of the marks, even where the parties' goods were in different product markets. *See, e.g.*, *Recot*, 214 F.3d at 1328 (finding likelihood of confusion between "Frito Lay" and "Fido Lay" even though one is used for snack chips and one is used for dog food); *Hunt Foods & Indus., Inc. v. Gerson Stewart Corp.*, 367 F.2d 431, 435 (C.C.P.A. 1966) (holding "Hunt's" for canned goods and "Hunt" for cleaning products confusingly similar); *American Sugar Refining Co. v. Andreassen*, 296 F.2d 783, 784 (C.C.P.A. 1961) (finding "Domino" for sugar and "Domino" for pet food confusingly similar); *Yale Elec. Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928) (finding "Yale" for flashlights and locks confusingly similar); *Quality Inns Int'l, Inc. v. McDonald's Corp.*, 695 F. Supp. 198, 221-22 (D. Md. 1988) (finding similarity between "McSleep Inn" and McDonald's' trademarks); *John Walker & Sons, Ltd. v. Bethea*, 305 F. Supp. 1302, 1307-08 (D.S.C. 1969) (finding "Johnnie Walker" whiskey and "Johnny Walker" hotels confusingly similar). But each of these cases is distinguishable. In some

of the cases cited by Kellogg, the courts *did* find that the goods were related. *See, e.g.*, *Recot*, 214 F.3d at 1328 (finding that some snack chip makers might also make dog food); *Hunt Foods*, 367 F.2d at 434 (finding a relationship between the respective products); *American Sugar Refining Co.*, 296 F.2d at 784 (finding goods related because both are sold at grocery stores); *Yale Elec. Corp.*, 26 F.2d at 974 (finding locks and flashlights related because "the trade has so classed them"). In the other cases cited by Kellogg, the names, as well as other marks, were either not only similar, but substantially identical, *see John Walker & Sons*, 305 F. Supp. at 1307-08 (comparing "Johnnie Walker" whiskey to "Johnny Walker" hotels and finding infringement where defendant also used same color scheme and same script); or the similar portion of the senior mark was both famous and fanciful, and thus so distinctive that its use would transcend its market.[2] *Cf. Recot*, 214 F.3d at 1328 (stating that "Frito Lay" word mark "casts a 'long shadow which competitors must avoid'") (citations omitted); *Quality Inns*, 695 F. Supp. at 216-21 (intimating that the prefix mark "Mc" used by McDonald's is highly distinctive in regard to anything but surnames).

But here, the parties' goods are completely unrelated, and the "Toucan Sam" and "Toucan Gold" word marks are similar only in that they each contain the common word "toucan." Although the name "Toucan Sam" is itself fanciful and distinctive, use of the word "toucan" for cereal is merely arbitrary. Kellogg has taken an everyday word and applied it to a setting where it is not naturally placed. *See, e.g.*, *Daddy's Junky Music Stores*, 109 F.3d at 280-81 (recognizing distinctiveness spectrum and stating that a mark is arbitrary

---

[2]It is also of note that in each of the cases cited by Kellogg, the infringed upon trademark was the actual name of the senior user's product. Here, Kellogg claims that TGI has infringed only upon the name of a character that represents Kellogg's product. This would again be a different case if TGI had named itself "Froot Loops Golf" or some derivative thereof.

when it is an everyday name or thing mismatched to the product it represents, such as "Camel" for cigarettes or "Apple" for computers). As opposed to a fanciful mark, an arbitrary mark is distinctive only within its product market and entitled to little or no protection outside of that area. *See, e.g.*, *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260 (5th Cir. 1980) (implying that plaintiff's arbitrary term "Domino" is entitled to no protection outside of the sugar and condiments market). Thus, unlike the *Recot, John Walker & Sons*, and *Quality Inns* cases, here TGI has not used any distinctive portion of Kellogg's word mark at all. Admittedly, we would have a far different case had TGI attempted to use a mark such as "Toucan Sam Gold" for its line of products, because the "Toucan Sam" word mark, in its entirety, is fanciful and likely transcends its market in the same way "Frito Lay" and the "Mc" prefix do. *Cf. Recot*, 214 F.3d at 1328; *Quality Inns*, 695 F.Supp. at 216-21. Kellogg has not cornered the market on all potential uses of the common bird name "toucan" in commerce, only on uses of "Toucan Sam." In regard to the word marks, TGI's apparently similar use is therefore not enough to overcome the unrelatedness of the goods.

As for the logos, the actual Toucan Sam design is fanciful. Hence, in step with cases like *Recot*, if TGI's GolfBird is similar to Toucan Sam's design, there may be a Lanham Act violation in spite of the unrelated goods. But we find GolfBird dissimilar to Toucan Sam. GolfBird resembles a real toucan. She has the look and proportions of a toucan that one would encounter in the wild. Toucan Sam is anthropomorphic, with a discolored, misshaped beak. His body type is not the same as that of a real toucan; and he smiles and has several other human features. We therefore find no similarity between Toucan Sam and GolfBird.

## 4. The Other Confusion Factors

The other five factors can be disposed of quickly. Kellogg has presented no evidence of actual customer confusion. Thus, we need not consider that factor.

The parties do not use similar avenues of commerce. Kellogg distributes Froot Loops through regular wholesale and retail channels. Kellogg advertises its product nationally on television and in print. Conversely, TGI distributes its product primarily at trade shows and over the internet. TGI does not sell its golf equipment via retail outlets or advertise on television or radio. *Cf. Hunt Foods*, 367 F.2d at 435 (finding same channels of commerce because both goods are sold at grocery stores); *American Sugar Refining Co.*, 296 F.2d at 784 (stating same).

TGI's clientele is primarily, and almost exclusively, comprised of corporations and wealthy golfers.[3] We find each of these groups to be sufficiently sophisticated, so as not to believe that Kellogg, a cereal company, has manufactured a golf club named "Toucan Gold." Moreover, we find the two industries sufficiently separate, so that there will rarely, if ever, exist a consumer who is looking for Kellogg's product in the golf equipment market.

Next, there is no evidence to suggest that Boyko chose his toucan marks in order to dishonestly trade on Kellogg's marks. Again, the goods are so unrelated as to dispose of this factor with little discussion. Boyko testified that he chose the name "toucan" because of any bird's obvious connection to the game of golf, as evidenced through golfing terms such as "eagle," "birdie," and "albatross." The district court found his testimony on this issue credible, and Kellogg has presented no evidence to cause us to doubt that Boyko's intent was not dishonorable.

---

[3] A set of Toucan Gold clubs costs $1500.

Lastly, there is no evidence to suggest that TGI has any desire to enter the cereal game, or that Kellogg has any plan to begin manufacturing golf equipment on a full-scale basis. As stated above, we do not believe Kellogg's limited licensing of golf balls and golf shirts with a Toucan Sam logo, nor the single 1982 advertisement wherein Toucan Sam parades around a golf course, announces Kellogg's entry into the golf market, or its intention to do so.

Accordingly, we find no likelihood of confusion between TGI's use of its marks— the word mark "Toucan Gold" and its GolfBird logo; and Kellogg's marks— the word mark "Toucan Sam" and the Toucan Sam design. In fact, the only of the eight factors we find in favor of Kellogg is the strength of its marks. The products sold by each party are wholly unrelated; the similarity between the word marks or the bird designs is not enough to overcome this unrelatedness; and TGI's clientele is not the sort to believe that Kellogg now manufactures golf clubs. We affirm the decision of the district court and find no likelihood of confusion.

## B. Dilution

Kellogg also raises claims of trademark dilution under the FTDA of 1995. The FTDA amended § 43 of the Lanham Act to include a remedy for "dilution of famous marks." 15 U.S.C. § 1125. "Dilution" is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods and services." FTDA § 4, 15 U.S.C. § 1127. Kellogg believes that TGI's marks dilute the fame of the Toucan Sam marks, and that Kellogg may oppose TGI's marks on that ground and obtain relief under the FTDA. The district court rejected Kellogg's argument.

Dilution law, unlike traditional trademark infringement law, does not exist to protect the public. It is not based on a likelihood of confusion standard, but only exists to protect the quasi-property rights a holder has in maintaining the integrity and distinctiveness of his mark. *See Moseley v. V Secret*

*Catalogue, Inc.*, 123 S.Ct. 1115, 1122 (2003); *see also* FTDA § 4, 15 U.S.C. § 1127. We have developed a five part test to determine whether dilution has occurred under the FTDA: the senior mark must be (1) famous; and (2) distinctive. Use of the junior mark must (3) be in commerce; (4) have begun subsequent to the senior mark becoming famous; and (5) cause dilution of the distinctive quality of the senior mark. *See, e.g.*, *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 577 (6th Cir. 2000).

The first four factors are not in dispute and require no discussion. The only factor before this Court is whether TGI has diluted Kellogg's Toucan Sam marks. The Supreme Court has held that, under the plain language of the FTDA, for a plaintiff to show dilution, he must demonstrate *actual* dilution, and not merely the likelihood of dilution. *Moseley*, 123 S.Ct. at 1124.

The plaintiff need not show actual loss of sales or profit, but the mere fact that customers might see the junior mark and associate it with a famous mark does not establish dilution. *Id.* at 1124. In *Moseley*, the defendant created a lingerie shop called "Victor's Little Secret." The owners of the more famous lingerie-related mark "Victoria's Secret" sued under the FTDA. The Supreme Court held that the plaintiff's claim failed, even though it presented evidence that consumers had associated the two marks. The plaintiff did not present any empirical evidence that consumers no longer clearly understood to which products the "Victoria's Secret" mark was related, and thus failed to demonstrate the "lessening of the capacity of the Victoria's Secret mark to identify and distinguish goods or services sold in Victoria's Secret stores or advertised in its catalogs." *Id.* at 1125. Likewise, here, Kellogg has presented no evidence that TGI's use of its toucan marks has caused consumers no longer to recognize that Toucan Sam represents only Froot Loops. In fact, Kellogg's own 1991 study indicated that 94% of children recognize Toucan Sam and 81% of children relate him to Froot Loops. Kellogg performed another study in

1997— after TGI started business— wherein it determined that 94% of adults likewise recognized Toucan Sam. Kellogg has failed to present evidence that any segment of the population recognizes Toucan Sam as the spokesbird only for Froot Loops in lesser numbers than it did before TGI started using its toucan marks. Accordingly, we affirm the decision of the district court and deny Kellogg's FTDA claims.

Kellogg asks this Court for a remand on this issue in light of the fact that the Supreme Court decided *Moseley* and clarified the dilution standard after the briefing stage in this case. Kellogg believes it is entitled to the opportunity to present empirical evidence of actual dilution before the district court. We find a remand inappropriate. In *Moseley*, the Supreme Court provided a stricter standard for proving dilution than the *likelihood* of dilution standard that was previously employed by this Court. *See V Secret Catalogue, Inc. v. Moseley*, 259 F.3d 464 (6th Cir. 2001), *rev'd*, 123 S.Ct. 1115 (2003). We find Kellogg's proffered empirical evidence insufficient even to meet the lesser standard.

### IV. Attorney's Fees and Sanctions

TGI has brought a separate motion for sanctions and attorney's fees. Under § 35(a) of the Lanham Act, the prevailing party may recover attorney's fees in "exceptional cases." 15 U.S.C. § 1117(a). TGI did not raise its claim below, but instead raises this issue for the first time on appeal. We have made clear in the past that the award of attorney's fees under § 35(a) is at the discretion of the district court alone. *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191-92 (6th Cir. 1997). Having not raised the issue with the district court, TGI's § 35 claim is waived. *See also Paccar, Inc. v. Telescan Technologies, L.L.C.*, 319 F.3d 243, 258 (6th Cir. 2003).

TGI also moves for "just damages" under Fed. R. App. P. 38. That rule provides:

> If a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond award just damages and single or double costs to the appellee.

TGI's argument that Kellogg's appeal is frivolous is based solely on the contention that Kellogg's arguments on appeal "mirror its arguments to the TTAB and the district court— and both tribunals rejected Kellogg's arguments as untenable." Brief for Respondent, at 55. However, the fact that Kellogg has repeated the same argument that failed below does not necessarily render that argument frivolous.

Kellogg has aggressively sought to protect its marks over the years. *See, e.g.*, *Exxon Corp.*, 209 F.3d 562; *Kellogg Co. v. Pack 'Em Enters., Inc.*, 951 F.2d 330 (Fed. Cir. 1991); *Kellogg Co. v. Western Family Foods, Inc.*, 1980 WL 39054, 209 U.S.P.Q. 440 (Trademark Tr. & App. Bd. Dec. 22, 1980); *see also* Bruce Walkley, *Toucan Sam's Cereal Killer*, Sydney Morning Herald (Australia), July 27, 1999, at 3 (recounting Kellogg's complaints against a company making fruit juice). And it has challenged smaller entities even where it is likely that no trademark infringement claim exists. *See, e.g.*, Sylvia Wieland Nogaki, *Seattle Band Throws Kellogg for a Loop*, Seattle Times, Mar. 10, 1995, at A1 (describing Kellogg's battle with a small Seattle music band over the name "Toucans"). But although many of Kellogg's claims against smaller companies may border on excessive and arguably warrant sanctions, the Supreme Court decision in *Moseley*, setting forth and changing the standards for trademark dilution in this Circuit, was not entered until after briefs were filed in this appeal. Therefore, we find sanctions under Fed. R. App. P. 38 inappropriate in this instance.

## V. Conclusion

For the foregoing reasons, we AFFIRM the decision of the district court.