AESTHETICS IN JEWELRY, INC.;
and James D. Jackson,
Appellants,

v.

Estate of Robinson S. BROWN, Jr., by and through its coexecutors, J. McCauley Brown and Robinson S. Brown, III, Appellees.

Estate Of Robinson S. Brown, Jr., Cross–Appellant,

v.

Aesthetics In Jewelry, Inc.; and James D. Jackson, Cross–Appellees.

Nos. 2009–CA–002056–MR, 2009–CA–002135–MR.

Court of Appeals of Kentucky.

April 8, 2011.

R. Gregg Hovious, Richard V. Evans, Louisville, KY, for Appellants/Cross–Appellees.

Glenn A. Cohen, Alan N. Linker, Cynthia L. Effinger, Louisville, KY, for Appellees/Cross–Appellants.

Before CAPERTON, COMBS, and KELLER, Judges.

## OPINION

CAPERTON, Judge:

The Appellees and Cross–Appellants, Estate of Robinson Brown, Jr. ("the Estate"), brought a number of claims against Appellants and Cross–Appellees James Jackson and Aesthetics in Jewelry (collectively, "Jackson"), arising out of the sale of certain jewelry by Jackson to Robinson Brown, Jr., including claims for negligent and fraudulent misrepresentation and a claim under the Kentucky Consumer Protection Act. Following trial, the jury found in Jackson's favor on all claims, but the court declined Jackson's request for an award of attorney fees. Jackson's appeal concerns only that issue. The Estate's cross-appeal arises out of the trial court's refusal to direct a verdict in its favor on its claims. Having reviewed the record, the arguments of the parties, and the applicable law, we affirm.

The facts pertinent to this appeal are as follows. Following his death, the children of Robinson Brown, Jr. (J. McCauley Brown and Robinson S. Brown, III, collectively, the "Browns") determined that he had overpaid for a suite of emerald and

diamond jewelry,[1] which he had purchased from Aesthetics in Jewelry and James D. Jackson in 2005. The record indicates that Brown had purchased jewelry from Jackson on several occasions prior to the transaction at issue sub judice, and that in February of 2005, he contacted Jackson to inquire about purchasing an emerald and diamond necklace with matching earrings. Shortly after this conversation, Jackson met Brown and his daughter-in-law, Eileen Brown, to discuss the purchase. Following this meeting, Jackson contacted Ray Zajicek, an emerald dealer, to find a jewelry suite which would meet Brown's specifications.

Prior to agreeing to purchase the jewelry, Brown asked to personally see the jewelry. On March 23, 2005, Zajicek, a jewelry wholesaler, flew from Texas to Louisville with the jewelry suite and brought it to Jackson's store. Jackson then inspected the jewels and computed their value at $509,185.52. After verifying the value of the jewelry, Jackson gave Zajicek a check for $500,000, but asked that he not negotiate it until Jackson completed the sale and obtained funds from Brown. Jackson then took the jewelry to Brown at his home and displayed it to Brown and his daughter-in-law. According to the Estate, Brown boasted at that time that he was getting a "great deal" on the purchase and was purchasing a suite worth more than a million dollars for only $800,000.

The Estate asserts that at that time, Jackson advised Brown that the jewelry had a retail value of approximately $1.2 million dollars.[2] Jackson asserts instead that he advised Brown at that time that the manufacturer's suggested retail price (MSRP) for the suite was $1,000,000. During the course of the trial, Jackson repeatedly denied making any representation that the suite had a retail value of $1,200,000. The Estate disagrees with Jackson as to his claim about the $1,000,000 MSRP value of the suite, and notes that Jackson conceded that this was not an actual price suggested by the manufacturer, but instead simply a multiplier of the wholesale value. The following testimony was given by Jackson on this issue:

**Jackson:** The MSRP is double what you pay for it.

**Trial Court:** I think they (referring to a juror's question concerning the alleged MSRP) are talking about this particular case.

**Jackson:** Okay. The closest thing I have is this picture, here, sir ... I was unaware of this at the time. I was going by what I paid for it, which is normal procedure in the industry.[3]

The Estate notes that the photograph to which Jackson referred during that testimony indicated a marked MSRP of $750,000 for the necklace alone, with no MSRP indicated for the earrings. Moreover, the Estate notes that both Jackson and Zajicek conceded at trial that, prior to sending a photograph of the suite to Jackson for display to Brown, Zajicek requested that the manufacturer, Krementz, alter the published photograph to delete both

---

1. The necklace in question contains Chivor-mined emeralds, including a rare center emerald stone weighing 18.67 carats. It has a total of 42.99–carat weight of fine emeralds, 34.28–carat weight of white diamonds (color E and clarity VS2), and .72 carats of fancy yellow diamonds (clarity VS2). The necklace is set in 55.4 penny weight of iridium platinum.

2. Such was the testimony of Brown's daughter-in-law, Eileen Brown.

3. Trial Tape, 07/15/09, testimony of James Jackson, at 11:44:40–11:45:06.

any identification of Krementz as the manufacturer as well as the $750,000 MSRP. Concerning this, Jackson testified as follows:

> **Counsel for the Estate:** Would it be fair to say that you knew Mr. Brown was a sophisticated enough businessman to know that no one buys jewelry at the MSRP; you always buy jewelry, especially at this level, below the MSRP when you are buying it, even at retail. Would it be fair to say that Mr. Brown was sophisticated enough to know that?
> **Jackson:** I would think he would have thought that.[4]

As noted, Brown ultimately agreed to purchase the jewelry for Jackson's asking price of $800,000, and wrote a check accordingly.[5] The Estate asserts that several days later, Jackson provided Brown with an appraisal from his store that confirmed the wholesale value of the jewelry at $960,000.[6]

Brown died shortly after purchasing the jewelry. His sons were appointed coexecutors of the estate and sought to sell the jewelry in the course of discharging their duties under the terms of Brown's will. The Estate asserts that they asked Jackson to sell the jewelry for an amount slightly less than the $960,000 wholesale value for which they allege he had appraised it. Months passed and, since Jackson had not located a buyer, the sons took the jewelry to New York to be appraised again. At that time, the jewelry appraised for less than the $800,000 that Brown had paid for it. This civil action followed.

Below, the Estate argued that the uncontroverted evidence established that Jackson knew the actual wholesale value of the jewelry to be approximately $500,000, as opposed to the $960,000 that he had represented to Brown. The Estate notes that this was the price at which the jewelry was offered to Jackson, a fact that he never told Brown.[7]

During the course of the trial below, the Estate took ten depositions in four states, and Jackson took one.[8] Below, Jackson retained three valuation experts and the Estate retained one. All four experts agreed that the "wholesale" value of the suite at the time of the sale was in the range of the $500,000 that Zajicek had charged Jackson, and that the retail value, while of course greater, did not reach or

---

4. Trial Tape, 07/15/09, testimony of James Jackson, at 11:58:31–11:59:34.

5. Jackson asserts that he never told Brown that he was paying $800,000 for the suite himself, but instead informed Brown that he (Jackson) could have sold it for that amount.

6. Jackson states that when providing the appraisal, he offered Brown two choices as to how it could be written. Jackson asserts that the first option was to appraise the suite at $1,200,000, a figure which would be arrived at by adding 20% to the manufacturer's suggested retail price of $1,000,000. The second option, an appraisal of $960,000, was arrived at by adding 20% to the sale price of $800,000 actually paid by Brown for the suite. Jackson also asserts that this post-sale appraisal was specifically for insurance purposes, and was not intended to establish a market price for the suite, and that the 20% markup was necessary to protect Brown's purchase in light of the difficulty associated with replacing such a rare and valuable suite.

7. The Estate asserts that Jackson produced no witnesses to testify that the wholesale or retail value of the jewelry was what he represented it to be, and also asserts that handwritten computations made by Jackson upon initial receipt of the jewelry measured the values of the individual components of the suite at a total value of slightly more than $500,000.

8. The Estate acknowledges that this is so, but points out that four of these depositions were of individuals whom Jackson had retained to testify as experts on his behalf.

even approach the $800,000 price for which Jackson had sold the jewels to Brown, or the $960,000 wholesale appraisal which he had provided thereafter.

One of the experts, Neil Cohen, a Master Gemologist Appraiser who was retained by Jackson, inspected the jewelry and provided Jackson with a written wholesale valuation of $550,000 for the suite. During the course of the trial, Cohen testified that a wholesale value of $700,000 would not have been supportable, and that he believed that Jackson's written and oral representations of the wholesale value of the jewelry—over $960,000—were inflated. Initially, Jackson had requested that Cohen provide his opinion as to the retail value of the jewelry. After inspecting the jewelry, however, Cohen informed Jackson and his counsel that in his opinion the retail value of the jewelry was between $625,000 and $650,000.

The testimony of Jackson's second expert, Patti Geolat, an Accredited Senior Appraiser, was excluded by the trial court following a Daubert[9] hearing because her methodology for determining the fair market value of the jewelry was flawed. Jackson's final valuation expert was Richard Drucker, a Graduate Gemologist and the president of a company by the name of Gemworld International, Inc. Drucker did not physically inspect the jewelry, but did review all information relevant to the suite. After doing so, he determined that a fair wholesale value for the jewelry was $500,000.

The Estate retained Barry Block, a Master Gemologist Appraiser and a Registered Master Valuer, as its expert. Block agreed with the other experts that the wholesale value of the jewelry was approximately $550,000. Further, he testified that the retail cost of the jewelry would be approximately 30% more than its wholesale value, which he stated was the industry standard for jewelry valued at over $100,000. Block testified that in his opinion, Jackson's wholesale appraisal of $960,000 was unjustified. As noted, following the trial in this matter, the Estate moved for a directed verdict on every count, arguing that Jackson had offered no evidence that the jewelry had even a retail value anywhere close to the wholesale value that he had represented. The trial court denied that motion, and the jury subsequently found in favor of Jackson on every count. Jackson then sought an award of his attorney fees and costs under the fee-shifting provisions of KRS 367.220(3),[10] which was denied by the trial court. As noted, the Estate appeals the denial of its directed verdict, and Jackson appeals the court's denial of his request for an award of attorney fees. We address these issues respectively.

On appeal, the Estate argues that the trial court erred in failing to direct a verdict in its favor on all counts alleged in the complaint. In support of that assertion, the Estate argues that all material elements of its claims were either conceded by Jackson or proven unequivocally by the evidence. The Estate argues that all of the evidence of record establishes that the jewelry was never worth as much as what Jackson represented it to be, and that Jackson knew this at the time of the sale. It points out that all of the experts estimated the wholesale value of the jewelry to be $500,000, and the retail value to be

9. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

10. KRS 367.220(3) provides that, "In any action brought by a person under this section, the court may award, to the prevailing party, in addition to the relief provided in this section, reasonable attorney's fees and costs."

approximately $650,000. Moreover, it notes that Jackson's own handwritten notes verifying the wholesale value of the jewelry indicated his belief that the jewelry had a wholesale value of $509,185.52, despite his later representations to Brown that it was $960,000.

The Estate also takes issue with the manner in which Jackson and his counsel conducted litigation below, alleging that Jackson repeatedly introduced irrelevant and inadmissible evidence in an attempt at jury nullification, including statements made to newspapers, inadmissible statements made as to Brown's purported intent in purchasing the jewelry, and Jackson's alleged financial plight.[11]

In response, Jackson asserts that he has always admitted that he told Mr. Brown that the suite was valued at over $900,000.[12] In support thereof, he relies on his testimony at trial, discussed herein *infra*, that the MSRP of the suite was $1,000,000. He asserts that, at trial and on appeal, the Estate has argued, unreasonably, that Brown relied on statements made after the sale (i.e., the $960,000 appraisal) in purchasing the suite. However, Jackson disagrees with the Estate's assertion that he told Brown the wholesale value of the jewelry was more than Brown would pay for it, or that it had an actual value in excess of $900,000. Jackson states that he never told Brown, prior to his purchase of the suite, that its wholesale value was more than $900,000. He also asserts that the only appraisal he made which actually does contain the word

11. Specifically, the Estate directs the attention of this Court to an interview Jackson's counsel gave to *The Courier–Journal*, which resulted in an article that appeared on the front page of the newspaper the day before trial. The Estate notes that this article included a substantial amount of irrelevant and inadmissible information supplied either by Jackson or his counsel. This included the fact that Robinson Brown, Jr. had been a high-ranking executive at the Brown–Forman Corporation for the majority of his life; that an adverse judgment would force Jackson into bankruptcy; that Mr. Brown had been "elated" with the purchase of the jewelry and had intended to pass it to his children after his death (these statements had previously been ruled to be hearsay and inadmissible at trial); and that Brown purchased the jewelry for sentimental reasons, without regard to its worth. The Estate points out that the article also included comments by a friend of Jackson—who is also in the jewelry business but was not identified as a witness at trial—opining: that the retail markup charged by Jackson was appropriate, a number of false statements about what the evidence in the case would be, and unsupported assertions that the Brown's heirs had received several offers to purchase the jewelry.

In light of the release of this article, an emergency hearing was conducted on the day before trial, at which time Jackson's counsel was admonished by the court, who advised that such statements not only ran the risk of influencing the jury, but also ran afoul of the Supreme Court Rules governing attorney comments to the press. At the same hearing, the court advised Jackson's counsel that evidence concerning Brown's alleged intentions when purchasing the necklace, including a possible intent to donate it to the Speed Art Museum, were not admissible at trial. The Estate notes that despite this admonishment, Jackson's counsel stated in opening that Brown wanted to donate the necklace to the museum, which it asserts left the impression that Brown would have knowingly paid far more than what the jewelry was worth because he intended to donate it to charity. The Estate also points out that Jackson's counsel elicited testimony concerning Jackson's difficult financial condition, the cost of his overhead, his monthly expenses, the number of employees he kept on payroll, and the taxes he was forced to pay on the $300,000 profit he made on the transaction with Brown.

12. Specifically in his answer, Jackson stated that he told Brown that, "although the Emerald Jewels are worth more than $900,000, Jackson could acquire them for Brown for only $800,000, and that the total cost to Brown, with sales tax, would be $848,000." *See* Complaint, at p. 10, TR 3, and Answer, at p. 6, TR 10.

"wholesale," was expressly written for insurance purposes, and specifically references the cost of replacement as the basis for the appraisal. He argues that as the prevailing party, he is entitled to have this question of fact resolved in his favor.[13]

■ In reviewing the arguments of the parties on this issue, we note that this Court will review a trial court's refusal to direct a verdict under a clear error standard. *See Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256 (Ky.App.2007). We note that the underlying decision of whether to direct a verdict rests on a determination of whether the jury's verdict can be supported with all evidence construed in favor of the prevailing party. *Lewis v. Bledsoe Surface Mining Co.*, 798 S.W.2d 459, 461 (Ky.1990). An appellate court may reverse the denial of a directed verdict if it determines, after reviewing the evidence in favor of the prevailing party, that the verdict is palpably or flagrantly against the evidence so as to indicate that it was reached as a result of passion or prejudice. *Id.* at 461–62, quoting *Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 860 (Ky.1988).

■ We also note that at issue in this appeal are three different potential theories of liability. In order to succeed on the first of those theories-fraud-a party must establish the following six elements by clear and convincing evidence: (1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the mis-

representation, and (6) that the misrepresentation caused injury to the plaintiff. *Flegles, Inc. v. Truserv Corp.*, 289 S.W.3d 544, 549 (Ky.2009), citing *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky.1999).

■ The second theory alleged by the Estate—negligent misrepresentation—similarly requires proof by clear and convincing evidence of a material representation that a defendant knew, or should have known, to be false. *Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 581 (Ky.2004). The third theory advanced by the Estate, an alleged violation of the Kentucky Consumer Protection Act, requires proof by clear and convincing evidence of "unfair, false, misleading, or deceptive acts," in a consumer transaction. *See* KRS 367.170.

Our review of the record indicates that Jackson himself analyzed the jewelry suite and determined its wholesale value to have been approximately $509,000. While these calculations are no doubt consistent with the testimony of each of the experts in this matter, and certainly are significantly lower than the amount that Brown actually paid for the jewelry, this Court does not find these facts determinative. Indeed, the pertinent inquiry in this matter is whether, prior to Brown's purchase of the jewelry, Jackson intentionally or negligently made material misrepresentations to Brown as to the value of the jewelry, and whether those misrepresentations induced Brown to purchase the jewelry. Having reviewed the record and arguments of the parties, we simply cannot find evidence that such was the case.

13. Jackson also notes that at the time Brown's estate was probated, the suite was listed as one of his assets, and was valued at the purchase price of $800,000, as opposed to the $960,000 wholesale appraisal that Jackson had provided after the purchase. Jackson asserts that this clearly indicates that Brown's heirs, and possibly Brown himself, understood the difference between the actual value of the suite and its replacement value.

Ultimately, this Court is of the opinion that the facts indicate that Brown was a willing buyer, and Jackson was a willing seller. The two men, of their own volition and under no compulsion, agreed upon a sale price for the suite at issue. While the Estate may understandably take issue with the substantial amount of profit made by Jackson on this transaction, such is not a basis for liability. Indeed, only evidence which would tend to establish that Jackson made material misrepresentations to Brown to induce the purchase would satisfy the burden of proof for the claims alleged. This Court, in reviewing the record, is unable to find evidence to indicate that such was the case.

Upon review, the record reveals that Jackson secured the suite requested by Brown, and that he computed its actual value at approximately $500,000. It indicates that he advised Brown of his belief that he could sell the jewelry for $800,000, and it indicates that Brown agreed to pay $800,000. It indicates that prior to the sale, Jackson made a representation to Brown as to his belief that the MSRP of the jewelry was $1,000,000.[14] It also establishes that subsequent to the sale, Jackson provided Brown with a "wholesale" appraisal of $960,000. Jackson asserted below, and on appeal, that this inflated estimate was based on replacement value and was provided for insurance purposes.

Upon review of the record, this Court simply cannot find any evidence that Jackson represented to Brown that the actual value of the jewelry itself was $800,000, $960,000, or any other number, prior to the time that Brown agreed to make his purchase. It does indicate that Jackson believed he could sell the jewelry to someone else for $800,000, and that he believed the MSRP to be $1,000,000, and that he advised Brown of these opinions prior to the purchase. Ultimately, these figures were Jackson's opinions, and this Court simply cannot conclude that by providing these opinions to Brown, Jackson was making the sort of material misrepresentations which the Estate was required to prove in bringing these claims.

Accordingly, upon consideration of all evidence in the light most favorable to Jackson, the prevailing party, we simply cannot conclude that the trial court acted erroneously in denying the Estate's motion for directed verdicts, and we decline to reverse on this basis. Having done so, we now turn to Jackson's sole basis for appeal. As noted, Jackson argues that the trial court committed reversible error in failing to grant attorney fees and costs to the prevailing party under the fee-shifting provisions of the Kentucky Consumer Protection Act. *See* KRS Chapter 367.

A trial court's decision about whether to award attorney fees under the Consumer Protection Act is reviewed for abuse of discretion. *Alexander v. S & M Motors, Inc.*, 28 S.W.3d 303, 305 (Ky.2000). A court abuses its discretion when it issues a decision which is arbitrary, unreasonable, unfair or unsupported by sound legal principles. *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000). Thus, in addressing Jackson's appeal, we must evaluate whether the trial court abused its discretion in denying Jackson's request for attorney fees as a prevailing defendant in an action filed under the Consumer Protection Act.

---

14. We acknowledge that there was testimony from Brown's daughter-in-law indicating that Jackson had represented this figure to be $1,200,000. Ultimately, it is the sole province of the jury to determine the weight and credibility of conflicting evidence. *See Taylor v. Kennedy*, 700 S.W.2d 415 (Ky.App.1985). We see no reason to disturb that determination upon appeal.

While Jackson acknowledges that there are no reported Kentucky decisions that award attorney fees to a prevailing defendant in a Consumer Protection Act case, he asserts that the plain language of the statute referring to an award of fees to the "prevailing party" clearly establishes that prevailing defendants may be awarded their fees. Jackson argues that the court had the clear authority to award attorney fees and, in this instance, abused its discretion in refusing to do so.

In support of that assertion, Jackson argues that the trial court failed to adequately consider the General Assembly's intention to create a fee-shifting provision which would guarantee equal access to the courts for all parties. While conceding that it is atypical for defendants in cases such as the Consumer Protection Act case sub judice to be awarded attorney fees as a result of claims filed by unsuccessful plaintiffs, Jackson argues that the logic which applies to fee-shifting provisions—equal access to the courts for all parties—applies as much when needed by a defendant as a plaintiff. Jackson argues that in the matter sub judice, in light of the significant economic disparities between the parties, being forced to bear the significant costs of protracted litigation has caused him to be the "loser" in this litigation, even though he prevailed at trial. Indeed, Jackson argues that the costs associated with defending this suit have brought financial ruin to the company, even though the jury ultimately found the allegations against it to be baseless.[15]

In response, the Estate argues that, contrary to the assertion made by Jackson, the financial circumstances of the parties are irrelevant to the issues to be determined. They assert that, despite Jackson's assertions, the trial court did not abdicate its duty to consider the propriety of an attorney fee award in this case. The Estate points out that the court expressly found that Kentucky's Consumer Protection Act permits recovery of attorney fees for a prevailing defendant, but appropriately found that such an award was not merited in this instance. The Estate argues that the trial court correctly determined that the Estate advanced this claim in good faith and that it was not frivolous. Accordingly, it asserts that the court correctly found that an award of attorney fees was not merited in this instance.[16]

---

**15.** In reviewing this argument, we note that there are numerous cases including one to which Jackson himself has directed our attention, which hold that differences in the resources of the party to a suit is not a valid basis for reallocation of fees. Indeed, in *Savannah College of Art and Design, Inc. v. Houeix,* 2005 WL 1073608 (S.D.Ohio 2005), the court noted that our own Sixth Circuit has not held that the disparate financial positions of the parties to an infringement action is a factor making an "exceptional" case for attorney fees. *See also Kellogg Co. v. Toucan Golf, Inc.,* 337 F.3d 616, 629 (6th Cir.2003), and *Eagles Ltd. v. American Eagle Foundation,* 356 F.3d 724 (C.A.6 (Tenn.) 2004). *See also Coombs' Adm'r v. Vibbert,* 289 Ky. 463, 158 S.W.2d 957, 960 (Ky.1942), holding that, "The wealth or financial standing of the parties has nothing to do with the merits of the issues of the case"; and *White v. Piles,* 589 S.W.2d 220, 222 (Ky.App.1979), holding that, "A defendant's ability or inability to pay a judgment is no more relevant to the issue of liability than is the fact of insurance. A case should be tried on the merits without reference to the wealth or poverty of the parties."

**16.** Jackson replies to these arguments by asserting that the trial court's order was not based on any sound legal principles; was by definition arbitrary, unreasonable, and unfair; and lacks factual findings to justify its ruling. In making these arguments, Jackson directs this Court to the holdings in *Smith v. Smythe–Cramer Co.,* 754 F.2d 180 (6th Cir.1985), holding that an award of attorney fees to a prevailing defendant in a civil rights action will depend on the factual circumstances of each case; and *Brooks v. Center Park Assocs.,* 33 F.3d 585 (6th Cir.1994), also holding that

■ The trial court determined, and we believe correctly, that KRS 367.220(3) gives the court the authority to award attorney fees to a prevailing defendant, hence the use of the word, "prevailing party." While there are some statutory provisions which specifically provide that only a plaintiff may be awarded attorney fees,[17] KRS 367.220(3) does not make such a distinction and refers only to the "prevailing party." Thus, we believe it clear that the statute provides for the possibility that the successful litigant, whether plaintiff or defendant, may be awarded attorney fees.

We believe that in the matter sub judice, the plain meaning of the statute is clear, particularly in light of other similar statutory provisions which have directly specified a particular party to receive a fee. It is well established that the most commonly stated rule in statutory interpretation is that the "plain meaning" of the statute controls. *Wheeler and Clevenger Oil Co., Inc. v. Washburn,* 127 S.W.3d 609, 614 (Ky.2004). Thus, our courts have steadfastly adhered to the plain meaning rule unless doing so would constitute an absurd result.

Further, we agree with the assertion made by Jackson that attorney fee-shifting provisions exist to ensure sufficient access to the courts for all parties. *See Alexander,* 28 S.W.3d at 305. However, we disagree with the argument that the trial court did not understand this principle in making its determination. To the contrary, we are in agreement with the Estate that the court considered the facts and evidence in the case sub judice, and made a conclusion, well within its discretion, that the award of attorney fees requested was not warranted in this case.

In so finding, the court specifically stated that, "[Appellees] prosecuted a good faith claim that withstood motions for summary judgment and directed verdict, and an award of attorney's fees would therefore be inequitable and contrary to the stated purpose of the Act." [18] In determining whether to award attorney fees to Jackson, the trial court was required to determine whether the claim brought by the Estate was frivolous, as well as whether it was advanced in good faith.[19] The court found in the Estate's favor on both counts, referencing both the good faith with which the claim was brought, and the substantive merits of the claim, as evidenced by its survival of multiple dispositive motions.

Indeed, we believe that the holding in *Deadwyler v. Volkswagen of America,*

---

an award of attorney fees to a prevailing defendant necessarily requires specific factual findings with respect to the basis of the award.

**17.** *See, e.g.,* KRS 362.517.

**18.** See TR 633–34, Exhibit E.

**19.** Both Jackson and the Estate analogize, and we believe appropriately, cases brought under the Consumer Protection Act to cases brought under the Civil Rights Act, insofar as in both instances, there is both an interest in awarding fees to a party who has been wrongly sued, and also an interest in ensuring that such awards are clearly merited, so as not to chill a plaintiff's willingness to bring suit at all and, thereby, undermine the express purpose of the litigation. *See, e.g., Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), which arose under 42 U.S.C. § 1983, and its fee-shifting provision, 42 U.S.C. § 1988, and which held that a prevailing defendant could recover fees under very limited circumstances, specifically where, "the plaintiff's action [is] frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Id.* at 421, 98 S.Ct. 694. *See also Hughes v. Rowe,* 449 U.S. 5, 14, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980); and *Tripp v. Jeld–Wen Inc.,* 327 Mont. 146, 112 P.3d 1018 (2005).

*Inc.,* 748 F.Supp. 1146 (W.D.N.C.1990), to which Jackson has referred our Court, to be supportive of the trial court's holding on this issue. In *Deadwyler,* a North Carolina federal court decision, which analyzed the consumer protection statutes of numerous states including Kentucky, specifically distinguished Kentucky's act and others employing the permissive "may" language to a fee award, from acts such as those in Florida and Mississippi where the fee-shifting language was mandatory. In denying Volkswagen's claim for fees incurred defending claims under permissive statutes like Kentucky's, the court evaluated the claims under a frivolousness standard, expressly deferring to the decision of the trial judge and noting that the judge had witnessed the proceeding below, and had denied Volkswagen's dispositive motions at various points in the litigation, stating:

> The Court has not and cannot find the Plaintiff's action to be frivolous, unreasonable, or without foundation. This Court was not the trial judge but has based this conclusion on the examination of the file, the arguments of counsel, the denial by the trial judge of motion filed by the Defendants to dismiss, for summary judgment, directed verdict, and the proceedings brought by the Federal Trade Commission.

*Deadwyler,* 748 F.Supp. at 1156.

In reviewing the order of the trial court, this Court notes that these are the same considerations articulated in its order denying the request for attorney fees made by Jackson. Having reviewed the order of the trial court and the record below, we cannot conclude that the trial court abused its discretion in finding as it did. Accordingly, we affirm on this issue.

Wherefore, for the foregoing reasons, we hereby affirm the October 14, 2009, order of the Jefferson Circuit Court denying Jackson's request for an award of attorney fees, as well as the jury verdict issued in this matter finding in favor of Jackson on all counts, the Honorable Frederic J. Cowan, presiding.

ALL CONCUR.